**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOHN LUIS BRACAMONTES and RONALD
WILLIAMS, individually and on behalf of
all others similarly situated,

       Plaintiffs,

*v.*

META PLATFORMS, INC. and
NETFLIX, INC.,

       Defendant.

## CLASS ACTION COMPLAINT

## Table of Contents

I.  Introduction ........................................................................................... 1

II. Parties .................................................................................................. 2

    A.  Plaintiffs ....................................................................................... 2

        1.  John Luis Bracamontes ...................................................... 2

        2.  Ronald Williams ................................................................ 3

    B.  Defendants ................................................................................... 3

III. Jurisdiction and Venue ....................................................................... 3

IV. Factual Allegations ............................................................................. 4

    A.  Facebook launches Watch, a direct competitor to Netflix's video-streaming platform. ........................................................................ 6

    B.  Facebook inexplicably defunds Watch despite the platform's success. ................. 10

    C.  Facebook agrees to refrain from direct competition in the streaming-video market in exchange for Netflix's subscriber data. .................. 11

V.  Class Action Allegations ................................................................... 18

VI. Tolling of the Statute of Limitations ................................................. 20

    A.  Discovery-Rule Tolling ............................................................. 20

    B.  Fraudulent-Concealment Tolling ............................................... 21

VII. Claim for Relief ............................................................................... 22

    Violation of Sherman Act, 15 U.S.C. § 1  Unlawful Allocation of Markets through an Agreement Not to  Compete in the Market for Video-Streaming Services ................................................................... 22

VIII. Prayer For Relief ............................................................................. 25

IX. Jury Demand ..................................................................................... 25

Plaintiffs John Luis Bracamontes and Ronald Williams bring this action against Defendants Meta Platforms, Inc. and Netflix, Inc. ("Netflix"), individually and on behalf of all others similarly situated, and allege the following based on personal knowledge, the investigation of counsel, and information and belief.

## I. INTRODUCTION

1.      This case is an embodiment of Adam Smith's famous maxim that "[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices."[1]

2.      In 2017, Netflix CEO Reed Hastings and Facebook[2] CEO Mark Zuckerberg became "of the same trade" when Facebook began to directly compete against Netflix in the market for video-streaming services by launching Watch, a video-streaming platform that offered consumers the same kind of TV-like shows that were Netflix's bread and butter.

3.      At the time, Hastings was on Facebook's board of directors and had been for many years. He met and communicated frequently with Zuckerberg and other Facebook executives about the competitive threat that Watch posed to Netflix.

4.      These conversations ultimately led to "a conspiracy against the public" when Zuckerberg and Hastings allocated markets by agreeing that Facebook would cede the video-streaming market to Netflix by hobbling the Watch platform. In exchange, Netflix would keep funneling its customers' data and advertising spend to Facebook (which used the Netflix data to further supercharge its lucrative targeted-advertising algorithms).

---

[1] Adam Smith, THE WEALTH OF NATIONS, Book IV Chapter VIII, p. 145, para. c27.

[2] Facebook, Inc. changed its name to Meta Platforms, Inc. on October 28, 2021. Throughout this Complaint, Defendant Meta is referred to as Facebook, as that was the company's name during most of the conduct relevant to this lawsuit.

5.      This anticompetitive agreement between Facebook and Netflix decreased consumer choices in video-streaming services while at the same time increasing consumer costs because Netflix was able to charge subscribers more than it would have but for Facebook's relinquishing the video-streaming market to Netflix.

6.      Indeed, in January 2019, shortly after Facebook and Netflix cemented their agreement not to compete in the video-streaming market, Netflix for the first time raised prices for *all* Netflix subscriptions.[3] At the time, these increases—ranging from 12.5 to 18% depending on the type of subscription—were "the biggest fee hikes in Netflix's history."[4]

7.      Adam Smith's "contrivance to raise prices" was in play.

## II.      PARTIES

### A. Plaintiffs

#### 1. John Luis Bracamontes

8.      Plaintiff John Luis Bracamontes is a natural person and a citizen of the State of Illinois. He currently subscribes to Netflix and has been a Netflix subscriber since November 2012.

9.      Mr. Bracamontes was harmed by Defendants' anticompetitive conduct because, as a result of the agreement, he had fewer choices in video-streaming services and paid more for his Netflix subscriptions than he would have but for Facebook's agreement to relinquish the video-streaming market to Netflix.

---

[3] Todd Spangler, *Netflix Hikes Price of U.S. Streaming Service: Standard Plan Jumps to $13 per Month*, VARIETY (Jan. 15, 2019), https://variety.com/2019/digital/news/netflix-us-streaming-price-increases-2019-1203108254/; *see also* Alex Munkachy, *The Complete History of Netflix Price Hikes - From 2007 to now*, FLIXED (updated Dec. 15, 2023), https://flixed.io/netflix-price-hikes.

[4] Todd Spangler, *Netflix Hikes Price of U.S. Streaming Service: Standard Plan Jumps to $13 per Month*, VARIETY (Jan. 15, 2019), https://variety.com/2019/digital/news/netflix-us-streaming-price-increases-2019-1203108254/.

**2. Ronald Williams**

10.     Plaintiff Ronald Williams is a natural person and a citizen of the State of Illinois. He currently subscribes to Netflix and has been a Netflix subscriber since at least July 2012.

11.     Mr. Williams was harmed by Defendants' anticompetitive conduct because, as a result of the agreement, he had fewer choices in video-streaming services and paid more for his Netflix subscriptions than he would have but for Facebook's agreement to relinquish the video-streaming market to Netflix.

**B. Defendants**

12.     Defendant Meta Platforms, Inc. is a publicly traded company incorporated in Delaware, with a principal place of business at 1 Meta Way, Menlo Park, California 94025.

13.     Meta Platforms, Inc. was formerly known as Facebook, Inc., and changed its name to Meta Platforms, Inc. on October 28, 2021. Throughout this Complaint, Defendant Meta is referred to as Facebook, as this was the company's name during most of the conduct at issue in this case.

14.     Defendant Netflix, Inc. is a publicly traded company incorporated in Delaware, with a principal place of business at 121 Albright Way, Los Gatos, California 95032.

### III.   JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (i) the proposed Class consists of well over 100 persons; (ii) the parties are minimally diverse, as members of the proposed Class, including Plaintiffs, are citizens of a state different from Defendant's home state; and (iii) the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.

16.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs bring claims under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), for damages and other relief to remedy Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

17.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants Meta and Netflix because Defendants deliberately targeted and exploited the Illinois market. Specifically, Meta has harvested the data of millions of Illinois residents who use the Facebook platform and has profited tremendously from inundating Illinois residents with targeted ads. Similarly, over a million Illinois residents subscribe to Netflix's streaming-video service, which Netflix advertises and promotes extensively within the state. Plaintiffs' claims therefore arise out of or relate to the contacts that Defendants Meta and Netflix have with the state of Illinois.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims occurred in this District. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants Meta and Netflix. Venue also is appropriate in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 (nationwide venue for antitrust matters).

## IV.     FACTUAL ALLEGATIONS

19.     In 2017, Facebook was the dominant social-media platform in the United States, with annual revenues of approximately $55 billion. Seventy-eight percent of U.S.

internet users were on Facebook, and the social-media giant had more than 2 billion users worldwide.[5]

20.     At the time, Netflix was the dominant over-the-top (OTT) video service (or video-streaming platform)[6]—namely, a service that "provides a viewer access to movies or TV shows by sending the media directly through the internet."[7] Of those U.S. homes that used at least one OTT video service, 75% subscribed to Netflix.[8] Although not as large as Facebook's, Netflix's annual revenue was $11.69 billion in 2017[9] and outpaced similar

---

[5] *Reach of selected social networks in the United States as of February 2017*, STATISTA (Apr. 21, 2017), https://www.statista.com/statistics/183682/us-social-media-website-ranking-by-number-of-users-logged-on/.

[6] As used in this Complaint, the term "video-streaming platform" is synonymous with the term "over-the-top video service." *See also Over-the-top media service*, WIKIPEDIA (last visited Apr. 8, 2024) ("Over-the-top (OTT) media service (also known as streaming platform) is a media service offered directly to viewers via the Internet. OTT bypasses cable, broadcast, and satellite television platforms—the media through which companies have traditionally acted as controllers or distributors of such content."), https://en.wikipedia.org/wiki/Over-the-top_media_service. *See also What is over-the-top (OTT)*, Adjust, https://www.adjust.com/glossary/ott-over-the-top/ (last visited Oct. 28, 2024) ("OTT stands for "over-the-top" and refers to technology (OTT services or platforms) that delivers streamed content via internet-connected devices… In the recent past, viewers consumed all video content from a TV set connected to a cable TV or satellite provider. However, viewers can now watch video content across multiple devices; no longer needing to be connected to cable or broadcast TV.").

[7] *5 Things You Need to Know About Over The Top Services*, MCDONOUGH TELEPHONE COOPERATIVE (last visited Apr. 8, 2024) (defining over-the-top media service), https://www.mdtc.net/5-things-to-know-about-over-the-top-services/.

[8] Sarah Perez, *Netflix reaches 75% of US streaming service viewers, but YouTube is catching up*, TECHCRUNCH (Apr. 10, 2017), https://techcrunch.com/2017/04/10/netflix-reaches-75-of-u-s-streaming-service-viewers-but-youtube-is-catching-up/.

[9] Netflix, Inc. Form 10-K (2017).

OTT video service companies by a longshot.[10] Netflix had at least twice as many subscribers as its nearest competitor.[11]

## A. Facebook launches Watch, a direct competitor to Netflix's video-streaming platform.

21.     Facebook has long been using social data from its users to inform and power the advertisements on its platform. Streaming video was a potential rich source of user social data that Facebook could mine for targeted advertisements. By 2016, Facebook included a video tab in its mobile product, but it had not yet introduced the type of long-form or episodic videos that were becoming prevalent in the market by streaming services like Netflix.

22.     In August 2017, however, Facebook burst onto the market for video-streaming services by launching Watch, a new platform for viewing video content on Facebook's website, including original programming funded by the company under the heading of Watch Originals.

23.     There was no doubt at the time that Watch was Facebook's bid to compete against the then-dominant video-streaming services like Netflix and Hulu. Indeed, the original promise of Watch was that it would provide consumers with "TV-like shows made by media companies" and that those shows would "compete with what's available live on TV and bingeable on Netflix and Hulu."[12]

---

[10] For example, Hulu's annual revenue was $3.1 billion in 2017. David Curry, *Hulu Revenue and Usage Statistics*, BUSINESS OF APPS (Sept. 4, 2024), https://www.businessofapps.com/data/hulu-statistics/.

[11] https://www.statista.com/statistics/258014/number-of-hulus-paying-subscribers/; https://backlinko.com/netflix-users

[12] Kerry Flynn, *Publishers put down pitchforks for Facebook, proceed into original video with caution*, MASHABLE (Aug. 12, 2017), https://mashable.com/article/facebook-watch-original-video-publishers-pitchfork.

6

24.     Consistent with that promise, upon its launch Watch was "set to debut original shows made by media partners exclusively for the social network, marking the company's official entry into the high-end online video world that already includes rivals Amazon, Netflix, Google, and Apple."[13]

25.     It was predicted that Watch and Watch Original programming would "be a cash cow" for Facebook, in part because the company's "massive user base of more than 2 billion people provide[d] an unprecedented opportunity for the company to monetize its video content"[14] The "massive user" base also provided Facebook with a rich data source from which it could determine the content its users would engage with on Watch.

26.     An analyst for the global investment firm Jefferies forecast that Watch "could be generating $12 billion in revenue by 2022."[15] By comparison, Netflix's annual revenue at the time was $11.69 billion.[16]

27.     In addition, Watch provided Facebook with a source of video interaction data for its artificial intelligence and machine learning models, which were used to inform, grow, and protect Facebook's social advertising business. Users were spending significant amounts of time consuming video streaming content, including algorithmically-recommended videos, which generate tremendously valuable insight into users' interest and purchasing

---

[13] Kerry Flynn, *Facebook is finally ready for its next big move: Taking on TV*, MASHABLE (Aug. 9, 2017), https://mashable.com/article/facebook-original-shows-watch-video-tab.

[14] Wayne Duggan, *Facebook Inc (FB) Watch Is a Massive Opportunity*, U.S. NEWS & WORLD REPORT (Dec. 21, 2017), *available at* https://news.yahoo.com/facebook-inc-fb-watch-massive-opportunity-125936549.html.

[15] Wayne Duggan, *Facebook Inc (FB) Watch Is a Massive Opportunity*, U.S. NEWS & WORLD REPORT (Dec. 21, 2017), *available at* https://news.yahoo.com/facebook-inc-fb-watch-massive-opportunity-125936549.html.

[16] *Netflix Revenue 2010-2023 | NFLX*, MACROTRENDS (last visited Apr. 4, 2024), https://www.macrotrends.net/stocks/charts/NFLX/netflix/revenue.

patterns. Watch thus provided Facebook with the opportunity to substantially grow (or further entrench its dominant position) in two different lines of business.

28.     Indeed, in the year and a half following its premiere, Watch was a success. By January 2019, the platform "ha[d] evolved from an imagined concept to a full, content-packed service with tens of millions of viewers," with Facebook reporting that "on average . . . 75 million daily visitors spend more than 20 minutes in Watch."[17]

29.     Facebook's foray into the market for original streaming-video content was not a whim; the company had been preparing to launch the video platform for years and had made substantial investments in video content before the platform was announced.

30.     As Facebook CEO Mark Zuckerberg said during an earnings call in February 2017, six months before launching Watch:

> [W]e're looking for ways to grow the ecosystem of video content on Facebook. We want people to think of Facebook as a place for interesting and relevant video content from professional creators as well as their friends. Last year we started to invest in more original video content to help seed the ecosystem, and we're planning to do more in 2017.[18]

31.     A year before Watch was announced, Facebook hired Ricky Van Veen, the founder of College Humor, as Watch's head of global creative strategy. In February 2017, the company also hired Mina Lefevre, the former head of scripted content for MTV.[19]

---

[17] Erica Barbara, *Watch Out! Facebook Watch is Changing Streaming*, U-WIRE (Jan. 30, 2019) (Westlaw); Tr. of Facebook, Inc. (FB) Fourth Quarter and Full Year 2018 Results Conference Call (Jan. 30, 2019) (reporting that, by the end of 2018, there were "400 million people who use[d] [Watch] every month, and people spen[t] on average over 20 minutes on Watch daily"), https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q4/Q4-2018-earnings-call-transcript.pdf.

[18] Tr. of Facebook, Inc. (FB) Fourth Quarter and Full Year 2016 Results Conference Call (Feb. 1, 2017), https://s21.q4cdn.com/399680738/files/doc_financials/2016/Q4/Q4'16-Earnings-Transcript.pdf.

[19] Kerry Flynn, *Facebook is finally ready for its next big move: Taking on TV*, MASHABLE (Aug. 9, 2017), https://mashable.com/article/facebook-original-shows-watch-video-tab.

32.     Van Veen and his team immediately began "meeting with media outlets and Hollywood studios and . . . ink[ing] deals for exclusive shows, not unlike what you see on television."[20]

33.     Content creators were lining up to provide original programming for Watch. One of the many publishers working with Facebook on video offerings for the platform described how "[i]t was extremely competitive getting a meeting with the [Watch] team," noting that, "Facebook, like it or not, is the biggest opportunity in video."[21]

34.     From the start, Facebook made clear that it intended to make substantial investments in video content for the platform, with plans "to spend $1 billion . . . on original video content, and becom[e] an exclusive TV hub by" 2018.[22]

35.     During an earnings call in November 2017, CFO David Wehner stated, "we are investing aggressively in video content for the Watch tab," and Zuckerberg confirmed that "we're going to continue investing heavily in video content for Watch."[23]

36.     In January 2018, Wehner again emphasized that Facebook was "continuing to invest to support this video strategy on Watch so we expect that content investment to continue and ramp."[24]

---

[20] Kerry Flynn, *Facebook is finally ready for its next big move: Taking on TV*, MASHABLE (Aug. 9, 2017), https://mashable.com/article/facebook-original-shows-watch-video-tab.

[21] Kerry Flynn, *Facebook is finally ready for its next big move: Taking on TV*, MASHABLE (Aug. 9, 2017), https://mashable.com/article/facebook-original-shows-watch-video-tab.

[22] Rashi Varshney, *Facebook to spend $1bn to bring original videos shows by next year*, MEDIANAMA (Sept. 11, 2017) (Westlaw).

[23] Tr. of Facebook, Inc. (FB) Third Quarter 2017 Results Conference Call (Nov. 1, 2017), https://s21.q4cdn.com/399680738/files/doc_financials/2017/Q3/Q3-'17-Earnings-call-transcript.pdf.

[24] Tr. of Facebook, Inc. (FB) Fourth Quarter and Full Year 2017 Results Conference Call (Jan. 31, 2018), https://s21.q4cdn.com/399680738/files/doc_financials/2017/Q4/Q4-17-Earnings-call-transcript.pdf.

37.     Although Watch was promoted mainly for its Watch Original content, Facebook invested significantly in acquired content for the platform by, among other things, purchasing the rights to all episodes of popular TV series such as *Buffy the Vampire Slayer*, *Angel*, and *Firefly* from 21st Century Fox. Facebook also identified shows like *House of Cards*, a popular Netflix series, and *Scandal*, and award-winning TV series, as examples of premium programming that it would be interested in purchasing for Watch.

**B.  Facebook inexplicably defunds Watch despite the platform's success.**

38.     Despite the early successes and seemingly boundless promise of Facebook Watch, by early 2019—less than a year and a half after launch—Facebook had reversed course and abandoned its ambitious long-term plans for the platform.

39.     Emblematic of this reversal was CEO Mark Zuckerberg's abrupt decision in May 2018 to cut nearly $1 billion from Watch's budgets for original content and sports for the following year.

40.     Then, in February 2019, Facebook reported that it would not be renewing most of the 21 news shows that it had only recently premiered as Watch Originals.[25]

41.     The cuts continued. By early January 2020, Facebook had announced that it would not be renewing a majority of its original programming, including popular and critically acclaimed content like the series *Sorry for Your Loss*: "Facebook is changing strategies for its video service, Facebook Watch, by pulling back on original scripted content ."[26]

---

[25] Sahil Patel, *Facebook won't renew two-thirds of existing Facebook Watch news shows*, DIGIDAY (Feb. 26, 2019), https://digiday.com/media/facebook-cancel-two-thirds-facebook-watch-news-shows/.

[26] Matt Binder, *People still don't know what Facebook Watch is. Facebook doesn't seem sure either.*, MASHABLE (Jan. 30, 2020), https://mashable.com/article/facebook-watch-original-programming; *see also* Nellie Andreeva, *Facebook Cancels 'Sorry For Your Loss' & 'Limetown' As*

42.     In short order, Facebook Watch stopped providing users with ambitious original content in favor of investing in original talk shows and licensing clips from network television and major sports leagues.

43.     Watch Originals limped on for a few more years with its content limited to a small slate of original talk shows, until the platform was finally shuttered by Facebook in 2023.[27]

44.     Facebook has never offered a persuasive—or even coherent—explanation for Watch's demise.

45.     So why didn't Facebook use its unmatched targeted advertising to more effectively promote Facebook Watch to its two billion users? And why did the company invest over one billion dollars into high-quality video content—to great initial success—only to effectively abandon the platform a year and a half after its debut?

**C. Facebook agrees to refrain from direct competition in the streaming-video market in exchange for Netflix's subscriber data.**

46.     Facebook's decision to mothball the Watch platform was a *quid pro quo*: In exchange for Facebook's eliminating Watch as a serious competitor in the video-streaming market, Netflix would continue to funnel its subscribers' data to Facebook and, of course, to purchase hundreds of millions of dollars in targeted advertising on the social-media platform. In other words, the two Defendants agreed to not compete by allocating markets to one another – video streaming to Netflix and data to Facebook.

---

*It Scales Back Scripted Efforts Amid Unscripted Push*, DEADLINE (Jan. 16, 2020), https://deadline.com/2020/01/sorry-for-your-loss-limetown-canceled-facebook-watch-scales-back-exits-scripted-series-unscripted-push-1202833262/.

[27] *See Meta Shuts Down Facebook Watch Originals Group, 'Red Table Talk' Canceled*, VARIETY (Apr. 26, 2023), https://variety.com/2023/digital/news/meta-shuts-down-facebook-watch-originals-mina-lefevre-1235596115/.

47.     At the time of the agreement at issue in this case, and still to this day, Netflix was and is a powerful source of valuable user data. Netflix content – including its movies and TV series – provide a glimpse into user interests and likely purchasing decisions. Netflix's service maintains strong recommendation algorithms that tailor its content to certain users. As explained in the Wall Street Journal in a November 10, 2018 article: "Analytics is deeply embedded in Netflix's DNA. The company mines reams of data on its subscribers' tastes to help determine which shows to bet on and how to promote them." The importance of Netflix's analytical acumen to Facebook's advertising business is clear.

48.     The agreement between Facebook and Netflix not to compete was a direct result of a "special relationship" between Facebook and Netflix—a relationship that began in 2011, when Netflix CEO Reed Hastings joined Facebook's board of directors.

49.     Hastings was more than just an observer on the Board; until 2019, he was the Chair of Facebook's special Compensation and Governance Committee, which was charged with monitoring and approving executive compensation, evaluating conflicts of interest, and evaluating proposed changes to Facebook's "Compliant with Laws – Competition" update to the company's Code of Conduct.

50.     The companies' special relationship was based upon various data-sharing agreements. Netflix was one of three companies to whom Facebook granted access to Facebook users' private messages, including the ability to "read, write and delete users' private messages, and to see all participants on a thread—privileges that appeared to go beyond what the companies needed to integrate Facebook into their systems . . . ."[28] In

---

[28] Gabriel J.X. Dance, et al., *As Facebook Raised a Privacy Wall, It Carved an Opening for Tech Giants*, THE NEW YORK TIMES (Dec. 12, 2018), https://www.nytimes.com/2018/12/18/technology/facebook-privacy.html; *see also* Letter to Judge Donato, *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (Apr. 14, 2023), ECF No. 739.

return, Netflix would send detailed reports to Facebook about which videos its users were recommending to their friends, "show[ing] daily counts of recommendation sends and recipient clicks by interface, initiation surface, and/or implementation variant (e.g., Facebook vs. non-Facebook recommendation recipients)."[29]

51.     Mike Vernal, a vice president at Facebook, summarized the companies' special relationship in an email to Zuckerberg:

> We have historically gone out of our way to give Netflix the very best level of service and access—they are one of two partners . . . we allowed to build a custom GDP [Good Distribution Practice] experience. We've given them access to our messaging APIs . . . . We've given them a special version of the Coefficient API after a meeting between you + Reed. We gave thousands of dollars in free ad impressions to support their UK roll out . . . . We lobbied for them in DC to get the VPPA act updated. . . . [W]e've tried to prioritize things . . . important to them.[30]

52.     Defendants' agreement not to compete in the market for streaming-video services was shepherded by Hastings, who communicated directly with Zuckerberg and other Facebook executives—including Chief Operating Officer Sheryl Sandberg, Vice President Elliot Schrage, Chief Technology Officer Andrew Bosworth—to negotiate and cement the anticompetitive agreement.

53.     Discussions between Hastings and Facebook regarding the companies' allocation of markets started as early as August 2017 (when Watch debuted) and was finalized by April 2018—shortly before Zuckerberg personally defunded Watch and 9 months before the company publicly abandoned most of its Watch content.

---

[29] Letter to Judge Donato, *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (Apr. 14, 2023), ECF No. 739.

[30] Letter to Judge Donato, *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (Apr. 14, 2023), ECF No. 739.

54.    The agreement between the companies not only allowed Netflix to continue dominating the market for streaming-video services, and to benefit from the higher prices it could charge consumers because of that dominance, but it was also a financial windfall for Facebook's advertising business.

55.    Following Facebook's decision to defund Watch, Netflix agreed to increase its advertising spend on Facebook. Netflix paid Facebook approximately $40 million per year to run advertisements for its series and movies in the year before Facebook announced Watch, but that number increased to approximately $150 million to $200 million per year after Facebook voluntarily neutralized Watch as a competitive threat.

56.    In addition to the financial windfall, Facebook also obtained Netflix's agreement to limit its advertising on social media platforms that compete with Facebook, like Snapchat. Facebook thus received more advertising revenue from Netflix *and* kept money away from upstart social media platforms like Snapchat, which in turn further benefitted Facebook by solidifying its financial position in relation to its competitors.

57.    Finally, the value of Netflix's customer data to Facebook cannot be overstated. In 2015, Facebook severely restricted the access that third-party apps had to its platform, perceiving such apps as competitors. But by doing this, Facebook lost access to the vast amount of consumer data that it was harvesting through those third-party apps.

58.    Thus, Facebook was desperately seeking new sources of data about consumers' online behavior—data that it could use to train the machine-learning and AI systems that powered its profitable targeted-advertising business.

59.    In exchange for Facebook disbanding Watch, Netflix permitted Facebook to use some of its most powerful data signals in Facebook's advertising systems and models, which provided unmatched insight into user preferences and likely purchasing decisions.

14

Indeed, if Netflix were to share its valuable user data with a competing advertiser, that competitor could start to chip away at, and potentially overcome, Facebook's dominant position in advertising.

60. That is because personal user data, like the kind that Netflix provided to Facebook, is a highly valuable commodity, "becoming an asset more valuable than land, industry, or capital."[31] In the mid-2010s, the Strategy Unit of PwC "estimated that, in the financial sector alone, the revenue from commercializing data will grow to $300 billion per year by 2018."[32]

61. The value of and demand for user data has only increased in recent years alongside the rise of large language learning models. For example, a 2024 Reuters investigation found that after ChatGPT launched in 2022, "companies including Meta [formerly Facebook], Google, Amazon and Apple all struck agreements with stock image provider Shutterstock to use hundreds of millions of images, videos and music files in its library for training, according to a person familiar with the arrangements," that "ranged from $25 million to $50 million each [agreement]."[33]

62. Still, personal user data is even more valuable for advertising, with offsite or third-party data (*i.e.*, data generated outside the platform) holding special importance. This is especially true for Facebook. Offsite data is "viewed as highly valuable for digital

---

[31] *The Private-Sector Ecosystem of User Data in the Digital Age*, 29 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1099, 1107 (2019) (citing Omer Tene, Keynote Address, 26th Annual Intell. Prop. Media & Ent. L. J. Symposium).

[32] James E. Short & Steve Todd, *What's Your Data Worth?*, 58 MIT SLOAN MANAGEMENT REV. No. 3, at 18 (Spring 2016).

[33] Katie Paul & Anna Tong, *Inside Big Tech's underground race to buy AI training data*, REUTERS (Apr. 5, 2024), https://www.reuters.com/technology/inside-big-techs-underground-race-buy-ai-training-data-2024-04-05/.

advertisers" because it "may help target ads better."[34] Researchers found that ad effectiveness on Facebook would be "substantially hampered" by the loss of offsite data, where the cost to acquire each new customer with advertising would increase by 37%.[35]

63.     When looking at Facebook's 2023 worldwide advertising revenue ($113.64 billion),[36] conservative estimates indicate that Facebook received almost $3 billion in extra revenue from Netflix data transfers.[37]

64.     Facebook's advertising algorithm has two stages, both of which rely on personal user data. First, an advertiser selects a target audience based on user demographics and usage information,[38] often engaging in "micro-targeting"—changing the ad content "either across users (79%), across targeting attributes (65%), or across time (86%)."[39]

---

[34] Nils Wernerfelt et al, *Estimating the Value of Offsite Data to Advertisers on Meta*, Becker Friedman Institute, U. Chicago, Working Paper No. 2022-114 (Aug. 2022), at 1.

[35] *Id.* at 26.

[36] *Advertising revenues generated by Facebook worldwide from 2017 to 2027*, Statista, https://www.statista.com/statistics/544001/facebooks-advertising-revenue-worldwide-usa (last visited Oct. 22, 2024).

[37] In 2023, Facebook had 3 billion users and generated $113.64 billion in worldwide advertising revenue, equating to more than $37 per user, per year ($113.64/3 = $37.88). This means that an increase in advertising effectiveness of 37% from the use of offsite data could be responsible for $10 of that advertising revenue per user affected ($10 = $37*(0.37/1+0.37)). Using the assumption that the 277,650,000 Netflix users are also Facebook users, $10*277,650,000 = $2,776,500,000. *See also Netflix*, Statista, https://www.statista.com/study/15313/netflix-statista-dossier/ (last visited Oct. 22, 2024).

[38] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver Ads?*, META (June 11, 2020), https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads.

[39] Athanasios Andreou et al, Network & Distributed Systems Security Symposium 2019, Measuring the Facebook Advertising Ecosystem 1 (Feb. 2019), available at https://www.ndss-symposium.org/wp-content/uploads/2019/02/ndss2019_04B-1_Andreou_paper.pdf.

65.     Second, to determine which ads are shown to a Facebook user, the algorithm gathers ads "that include that person in the advertiser's chosen audience,"[40] pulling from "a list of over 200,000 attributes provided by Facebook."[41] At this stage, Facebook uses machine learning to calculate an estimated action rate, where models:

> predict a particular person's likelihood of taking the advertiser's desired action, … like increasing visits to their website or driving purchases. To do this, [Facebook's] models **consider that person's behavior on and off Facebook**, as well as other factors, such as the content of the ad, the time of day, and interactions between people and ads.[42]

66.     By Facebook's own admission, personal user data from both Facebook and third parties like Netflix makes Facebook's targeted advertising more effective.

67.     For these reasons, Facebook was willing to kneecap its Watch video service in exchange for extremely valuable consumer data from Netflix as well as Netflix's dramatic increase in its spending on Facebook advertising.

68.     Importantly, Facebook and Netflix also entered into an agreement to build a dynamic advertising model that would target users with Netflix content specifically. This model was precisely the kind of targeting that Facebook would have needed to do in order to promote its own Watch product, but instead it was undertaking the effort to promote Netflix's streaming product in exchange for user data to supercharge and train its advertising systems.

---

[40] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver Ads?*, META (June 11, 2020), https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads.

[41] Athanasios Andreou et al, Network & Distributed Systems Security Symposium 2019, Measuring the Facebook Advertising Ecosystem 1 (Feb. 2019), available at https://www.ndss-symposium.org/wp-content/uploads/2019/02/ndss2019_04B-1_Andreou_paper.pdf.

[42] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver Ads?*, META (June 11, 2020), https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads (emphasis added).

## V.    CLASS ACTION ALLEGATIONS

69.    Plaintiffs John Luis Bracamontes and Ronald Williams bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

> All persons residing in the United States who paid for Netflix video streaming services at any time between August 9, 2017 and the present.

70.    Excluded from the Class are Defendants Meta and Netflix, any entities in which either Defendant has a controlling interest, as well as any of either Defendant's legal representatives, officers, directors, assignees, and successors.

71.    Members of the Class are so numerous that joinder of all Class Members is impractical. Currently, there are over 66 million Netflix subscribers in the United States,[43] and there were approximately 58 million U.S. subscribers in 2018, at the beginning of the class period.[44] Thus, by conservative estimates, Class Members number in the tens of millions. Class Members are readily identifiable from information and records in Netflix's possession.

72.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and Class Members were aggrieved by the same wrongful conduct of Facebook and Netflix: that Facebook would cease to compete against Netflix in the market for video-streaming services in exchange for Netflix providing its customers' data to Facebook and purchasing even more targeted advertising from the social-media company.

---

[43] *Netflix Users by Country 2024*, WORLD POPULATION REVIEW (last visited Apr. 3, 2024), https://worldpopulationreview.com/country-rankings/netflix-users-by-country. \

[44] *See* Steven Zauderer, *Netflix Statistics and Insights: Analyzing the Impact*, CROSS RIVER THERAPY (Mar. 19, 2024), https://www.crossrivertherapy.com/research/netflix-statistics.

73. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class.

74. Plaintiffs are represented by counsel with experience in the prosecution of class actions and with particular experience with class actions raising antitrust claims under the Sherman Act.

75. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants Meta and Netflix have acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants wrongful actions.

76. Questions of law and fact common to the Class include:

    a. whether Defendants agreed not to compete in the market for video-streaming services;

    b. whether Defendants agreed to allocate markets;

    c. whether Defendants unreasonably restrained trade;

    d. whether Defendants' anticompetitive agreements caused Plaintiff and Class Members to pay more for Netflix services than they would have paid but for those agreements;

    e. the appropriate Class-wide measure of damages;

    f. whether, and in what amount, Plaintiff and the other Class members are entitled to recover treble damages, court costs, and attorneys' fees; and

    g. whether Defendants' anti-competitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

77. Class-action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly

situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

78.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery-Rule Tolling

79.     The discovery rule tolls the running of the statute of limitations until a plaintiff knows or has reason to know of the injury which is the basis of the action.

80.     The discovery rule tolled the statute of limitations in this case until at least March 21, 2024, when Judge Donato unsealed documents in *Klein v. Meta Platforms, Inc.*[45] Those documents revealed for the first time that Facebook "starved its Facebook Watch video service to appease Netflix and sustain its ad monopoly."[46]

81.     Plaintiffs and Class Members could not have reasonably discovered Defendants' anticompetitive agreement before Judge Donato unsealed those documents.

82.     For the above reasons, the applicable statute of limitations has been tolled by operation of the discovery rule.

---

[45] *See* Order re Motions to Seal, *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (N.D. Cal. Mar. 21, 2024), ECF No. 734; Letter to Judge Donato, *Klein*, No. 20-cv-08570-JD, ECF No. 739.

[46] Thomas Claburn, *Lawsuit claims Meta hobbled Facebook Watch to help Netflix*, THE REGISTER (Apr. 2, 2024), https://www.theregister.com/2024/04/02/meta_facebook_watch_netflix/.

## B.  Fraudulent-Concealment Tolling

83.     The applicable statute of limitations also has been tolled by Defendants'
fraudulent concealment throughout the period relevant to this action.

84.     Facebook CEO Mark Zuckerberg made numerous public statements about
the company's strategy for its streaming-video platform, Watch, that constitute affirmative
acts to mislead the public.

85.     For example, during a quarterly earnings call in January 2020, Zuckerberg
liked to investors by stating that Facebook's "video strategy . . . has been pretty consistent"
and that the "content acquisition" for the Watch platform was "more along the lines of
either marketing or bringing new people into the [Facebook] experience."[47]

86.     These false statements were intended to obscure the real reason for Watch's
stagnation. Rather than informing investors that Facebook had deliberately defunded Watch
as part of an agreement with Netflix to cede the market for video-streaming services,
Zuckerberg's statements falsely suggested that the purpose of Watch had always been as a
way to "market" Facebook.

87.     The statute of limitations is therefore tolled by Defendants' fraudulently
concealing their agreement not to compete in the market for video-streaming services.

---

[47] Facebook, Inc. (FB) Fourth Quarter 2019 Results Conference Call (Jan. 29, 2020),
https://s21.q4cdn.com/399680738/files/doc_financials/2019/q4/Q4'19-FB-Earnings-Call-Transcript.pdf.

## VII.    CLAIM FOR RELIEF

### Violation of Sherman Act, 15 U.S.C. § 1
### Unlawful Allocation of Markets through an Agreement Not to
### Compete in the Market for Video-Streaming Services

88.    Plaintiffs repeat and incorporate by reference all preceding paragraphs and

allegations.

89.    The agreement between Facebook and Netflix to allocate markets by not

competing in the market for video-streaming services is a *per se* violation of 15 U.S.C. § 1.

90.    Netflix has been a participant in the market for video-streaming services since

it began to offer its subscribers access to streaming video in 2007.

91.    On August 9, 2017, Facebook began competing with Netflix the market for

video-streaming services by launching Watch, its own video-streaming platform.

92.    Because of Facebook's deep pockets, advertising acumen, and unique access

to its 2 billion users, Facebook Watch presented a serious threat to Netflix's market share.

93.    Indeed, Facebook's investments in Watch were substantial and the platform

amassed significant viewers in the year and a half after its debut.

94.    By early 2019, however, Facebook and Netflix had agreed that Facebook

would desist from competing with Netflix through its Watch streaming platform. To effect

this agreement, Facebook cut the vast majority of Watch funding, canceled most Watch

programming, and minimized advertising for its streaming platform.

95.    In exchange for Facebook shutting down Watch, Netflix agreed to purchase

additional targeted advertising on the social-media platform and to share with Facebook

data regarding the behavior of Netflix users, which Facebook used to improve its

targeted-advertising algorithms.

96.     Given the roles of Facebook and Netflix in the social-network and video-streaming markets, respectively, this anticompetitive agreement had substantial effects on interstate commerce.

97.     Defendants' anticompetitive agreement also harmed Plaintiffs and Class Members because (1) they had fewer choices in video-streaming services and (2) paid more for their Netflix subscriptions than they would have been but for Facebook's relinquishing the video-streaming market to Netflix.

98.     The effect on consumers is evidenced by, among other things, Netflix raising prices in January 2019, shortly after Facebook and Netflix cemented their agreement not to compete in the video-streaming market. This was the first time that Netflix raised prices for *all* Netflix subscriptions. At the time, the fee hikes were the biggest in Netflix's history, ranging from 12.5 to 18% depending on the type of subscription.

99.     The agreement between Facebook and Netflix to allocate markets by not competing in the market for video-streaming services likewise violates 15 U.S.C. § 1 under the rule of reason.

100.    Specifically, Defendants' agreement had an adverse impact on competition in the U.S. market for video-streaming services and the submarket for original programming delivered via video-streaming services.

101.    When Defendants finalized their anticompetitive agreement in 2018, 89% of consumers who subscribed to a streaming-video service subscribed to Netflix.[48]

---

[48] Jeff Ewing, *Market Research Highlights Netflix's Continued Dominance Of The SVOD Market*, FORBES (Dec. 10, 2018), https://www.forbes.com/sites/jeffewing/2018/12/10/ netflix-continues-svod-market-dominance/.

102.    Analysts ascribed Netflix's success at the time to "its hyper-customized content and suggestions, which helps to increase engagement and reduce abandonment, and a significant investment in original content."[49]

103.    These features of Netflix—hyper-customized content and suggestions, and original video content—are precisely the features that made Facebook Watch a danger to Netflix in the video-streaming market.

104.    No company had more data about its users than Facebook, and even in 2018, the company's ability to target ads "[was] so eerily accurate [that] people ha[d] begun to believe that Facebook [was] somehow listening to them through their phone."[50]

105.    And before Defendants entered their anticompetitive agreement, Facebook had decided to make a significant investment of $1 billion in original content for the Watch platform.

106.    All of this—plus the fact that Facebook Watch would offer its video content to consumers for *free*—meant that Watch was poised to be a significant competitor to Netflix in the market for video-streaming services.

107.    But the competitive threat that Watch posed to Netflix never fully materialized because of Defendants' agreement that Facebook would dismantle Watch in return for Netflix providing consumer data and purchasing even more social-media advertising.

---

[49] Jeff Ewing, *Market Research Highlights Netflix's Continued Dominance Of The SVOD Market*, FORBES (Dec. 10, 2018), https://www.forbes.com/sites/jeffewing/2018/12/10/netflix-continues-svod-market-dominance/.

[50] Michelle Castillo, *Here's how Facebook ad tracking and targeting works*, CNBC (Mar. 19, 2018), https://www.cnbc.com/2018/03/19/how-facebook-ad-tracking-and-targeting-works.html.

108.    As a result, Plaintiffs and Class Members had fewer choices in video-streaming services and paid more for their Netflix subscriptions than they would have paid but for Defendants' anticompetitive agreement.

## VIII.   PRAYER FOR RELIEF

109.    WHEREFORE, on behalf of themselves and the Class, Plaintiffs respectfully request that this Court enter an Order:

    a.  Certifying this case as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the Class defined above, appointing Plaintiffs John Luis Bracamontes and Ronald Williams as representatives of the Class, and appointing their counsel as Class Counsel;

    b.  Awarding Plaintiffs and Class Members treble damages under 15 U.S.C. § 15(a);

    c.  Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class;

    d.  Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

    e.  Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

    f.  Awarding such other and further relief as equity and justice may require.

## IX.   JURY DEMAND

110.    Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 18, 2024

                               */s/ Justin N. Boley*

                               Kenneth A. Wexler
                               Justin N. Boley
                               Tyler Story
                               Zoran Tasić
                               Margaret Shadid
                               WEXLER BOLEY & ELGERSMA LLP
                               311 South Wacker Drive, Suite 5450
                               Chicago, IL 60606

Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com
zt@wbe-llp.com
ms@wbe-llp.com

Kevin Landau
Archana Tamoshunas
TAUS, CEBULASH & LANDAU, LLP
123 William St., Ste. 1900A
New York, NY 10038
Tel: (212) 931-0704
Fax: (212) 931-0703
klandau@tcllaw.com
atamoshunas@tcllaw.com

Daniel C. Hedlund
Michelle J. Looby
Bailey Twyman-Metzger
GUSTAFSON GLUEK, PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-884
Fax: (612) 339-6622
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
btwymanmetzger@gustafsongluek.com

*Attorneys for Plaintiffs and
Proposed Class*